1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11  CARL BARTEAU,                        )   CASE NO: CV08-02733 RSWL
                                         )   (FMOx)
12              Plaintiff,               )
                                         )   FINDINGS   OF   FACT   AND
13       VS.                             )   CONCLUSIONS OF LAW
                                         )
14  PRUDENTIAL INSURANCE                 )
    COMPANY OF AMERICA and LONG          )
15  TERM DISABILITY COVERAGE             )
    FOR ALL EMPLOYEES LOCATED            )
16  IN UNITED STATES OF DEVRY,           )
    INC.,                                )
17                                       )
                Defendants.              )
18                                       )
                                         )
19  _____ )

20

21

22

23

24

25

26

27

28

1

Plaintiff Carl Barteau filed a complaint against the Long Term Disability Coverage for All Employees Located in United States of DeVry, Inc. (the "Plan") and Prudential Insurance Company of America ("Prudential") alleging a failure to provide long term disability benefits in accordance with the Plan and the Employee Retirement Income Security Act of 1974. Prudential administers and insures the Plan. Both sides submitted their Opening Trial Briefs on March 17, 2009, and their Responsive Trial Briefs on April 1, 2009. Upon the filing of these briefs, on April 21, 2009, the Court conducted a bench trial and heard the arguments of both sides. The matter was taken under submission and the parties were Ordered to submit findings of fact and conclusions of law by May 5, 2009. Having received, reviewed, and considered the evidence, both parties briefs, the parties arguments at trial, and the parties findings of fact and conclusions of law, the Court has reached its decision.

## I.  FINDINGS OF FACT[1]

### A.  Mr. Barteau's Age, Education, Training and Experience

1.  Mr. Barteau was just shy of his 60th birthday when Prudential terminated the disability benefits Mr. Barteau had been receiving for the prior four years. (592).

2.  Prior to becoming disabled, Mr. Barteau had been an Assistant Professor of Mathematics at DeVry Institute of Technology for almost eight years. (179, 271-72).

3.  Mr. Barteau was qualified to be a teacher based on his Post Graduate degree from the University of Vermont where his area of concentration was computer applications of mathematics. (542).

4.  Mr. Barteau's education, training, and experienced focused on utilizing superior cognitive abilities, including the ability to read, write, and think clearly and logically. (272).

### B.  Mr. Barteau is Hospitalized and Short Term Disability Benefits Are Approved

---

[1] Unless otherwise noted, citations are to the record lodged by Prudential on March 17, 2009, and bates stamped AR ####. For ease of reference the "AR" and any intervening zeros have been omitted.

2

5.     Mr. Barteau suffered problems with his right eye since he was a child. (179). At that time he sustained an injury when a steel fragment became lodged in his eye. (179). At around age 20 he had cataract surgery in his right eye and regained fairly normal vision. (179). As time passed, Mr. Barteau's eye degenerated. (179).

6.     In September of 2002, Mr. Barteau had surgery for glaucoma in his right eye. (179). He was told at that point that the glaucoma surgery had been complicated by a scratched cornea. (179). The result was that Mr. Barteau was instructed to wear a replaceable contact lens. (179). His physician reassured him that the eye would spontaneously heal. (179).

7.     The contact lens Mr. Barteau was instructed to wear needed to be replaced every few days, a process that left Mr. Barteau in "excruciating pain." (179). Because the pain had reached a point that it was unbearable, Mr. Barteau sought alternative treatment through UCLA. (179).

8.     Treatment at UCLA commenced on January 7, 2003, the date which proved to be Mr. Barteau's date of disability. (271).

9.     On January 7, 2003 and January 10, 2003, to determine the cause of Mr. Barteau's pain, biopsies of his eye were taken from which cultures showed evidence of an eye fungus. (179). Two more biopsies followed, each growing fungus cultures. (179).

10.     On January 17, 2003, Mr. Barteau was admitted to the hospital because there had been worsening of the inflammation in the anterior chamber of his eye. (179). During his hospitalization Mr. Barteau continued to experience eye pain. (179). This was "clearly a very serious eye infection with serious risk of loss of vision or loss of the eye entirely." (180).

11.     Mr. Barteau's medical records continually noted the eye pain from which he suffered.  Pain management medications were prescribed, including oxycontin, vicodin, and morphine injections. (177, 181, 216).

12.     In a letter dated January 30, 2003, Dr. Anthony J. Aldave, ophthalmology, memorialized that Mr. Barteau remained hospitalized. (228). A surgical procedure had

been performed to remove a large part of the infection from Mr. Barteau's right eye, however, he was to remain in the hospital for several more days and it was anticipated he would require frequent visitations after his discharge. (228).

13.    In a letter dated February 14, 2003, Dr. Aldave documented that Mr. Barteau had been released from the hospital on February 4, 2003, but Mr. Barteau continued to be followed closely. (252). Mr. Barteau was experiencing significant discomfort associated with his eye infection which Dr. Aldave hoped was "finally under control." (252). Dr. Aldave documented the possibility that further surgery might be necessary. (252).

14.    Further surgery was conducted on February 22, 2003 when Mr. Barteau elected to proceed with patch penetrating keratoplasty OD in an attempt to seal his globe. (255).

15.    Following the February 22, 2003 surgery, Dr. Aldave opined that Mr. Barteau experienced a lack of useful vision in his right eye and disabling light sensitivity in both eyes. (259). Dr. Aldave estimated that Mr. Barteau would be able to return to work in July 2003. (259).

16.    Mr. Barteau was an enrolled member of his employer's short and long term disability plans. On July 6, 2003, Mr. Barteau's claim for short term disability benefits was approved through the maximum period. (267).

**C.    Mr. Barteau's Attempt at Returning to Work is Unsuccessful and Prudential Determines Mr. Barteau is Totally Disabled**

17.    As Mr. Barteau's short term disability benefits were expiring, he attempted to create a lecture in an effort to return to work. (96). This proved difficult for Mr. Barteau as his vision became blurry and he could not handle the pain. (96).

18.    On July 2, 2003, Mr. Barteau submitted a claim for long term disability ("LTD") benefits through Prudential. (281). Mr. Barteau claimed he was prevented from working due to "loss of vision right eye, eye strain to left eye, headaches, blurry vision." (281).

4

19.    Dr. Dirk Ruffin, Mr. Barteau's general medical treatment provider, certified Mr. Barteau's disability on the basis of Mr. Barteau's difficulty with focus and headaches along with his right eye blindness. (284).

20.    In a letter dated August 27, 2003, Prudential informed Mr. Barteau that Prudential had analyzed Mr. Barteau's medical records, found him to be totally disabled from his own job as a professor, and approved LTD benefits. (287-89).

**D.    Prudential Recommends Mr. Barteau Apply for Social Security Disability Benefits and Hires Him Professional Assistance to Advocate For His Disability**

21.    Prudential advised Mr. Barteau to apply for Social Security Disability benefits because Prudential "expect[ed] him to be (out of work) for an extended period." (97).

22.    Mr. Barteau applied for Social Security Disability benefits and in a letter dated December 16, 2003, Mr. Barteau was denied Social Security Disability benefits. (299).

23.    After Mr. Barteau advised Prudential that he had been denied Social Security Disability benefits, Prudential wrote to Mr. Barteau and informed him that "according to the information in our files," Prudential felt it was in his best interest to appeal the denial. (297). Prudential offered to make the services of Allsup Inc. Social Security Consultants ("Allsup") available to Mr. Barteau at "absolutely <u>no cost</u> to you, as Prudential will pay their entire fee." (297). Prudential was offering to pay for professionals to pursue benefits that were only available to Mr. Barteau if he was unable to work any work. (297).

24.    If Mr. Barteau received Social Security Disability benefits, these benefits were a dollar for dollar offset to the benefits Prudential had to pay Mr. Barteau. (27, 297).

25.    Mr. Barteau accepted Prudential's offer to hire Allsup to advocate for Mr. Barteau's disability. (398).

26.    In February 2004, Allsup contacted Dr. Ruffin and asked him to complete a functional capacity assessment for Mr. Barteau. (398).

27.     Allsup provided Dr. Ruffin with forms tailored to Mr. Barteau's disabling conditions. (399-401). These personalized forms included questions regarding Mr. Barteau's headaches, attention and concentration. (399).

28.     On March 30, 2004, Prudential sought an update from Mr. Barteau on his condition. (98-99). Prudential was informed that Mr. Barteau had no vision in his right eye and his left eye vision was blurry. (99). Mr. Barteau had suffered permanent nerve damage and his vision would not get any better. (99). Further, Prudential was informed that Mr. Barteau was experiencing migraine headaches frequently. (99). These headaches came on when Mr. Barteau tried to read or when he tried to watch TV during the day. (99). Mr. Barteau took amitriptyline to treat the migraines. (99). Prudential was also informed that Mr. Barteau continued to try to maintain some level of usefulness and thus he helped his fiancé manage her rental properties. (99).  There is no indication that Mr. Barteau was paid for any assistance he provided to his fiancé, nor did Prudential ask Mr. Barteau what help he was providing to his fiancé.

29.     In April 2004, Dr. Ruffin completed the tailored forms Allsup had provided Dr. Ruffin and documented therein that Mr. Barteau experienced headaches "[a]ll day long if not taking Amitryptyline." (399). Mr. Barteau's headaches were "Severe," having the impact of precluding the attention and concentration required for even simple, unskilled work tasks. (399).

30.     Dr. Ruffin also documented that Mr. Barteau's headaches and visual adjustments provided a "reasonable medical basis" for the fatigue Mr. Barteau suffered from. (361).This fatigue was disabling to the extent that it prevented Mr. Barteau from working full time at even a sedentary position. (361).

**E.     Prudential Continues To Investigate Mr. Barteau's Disability**

31.     Prudential followed up on Mr. Barteau's condition in August of 2004. (99). Prudential discovered that Mr. Barteau's condition remained the same – including that he experienced very bad headaches for which he took pain medicine at night (which made him sleepy) and over the counter medicine during the day. (99).

6

32.     In September of 2004, Prudential followed up on Mr. Barteau's condition. (100). Prudential learned that Mr. Barteau was still blind in his right eye and that his migraines caused blurry vision in his left eye. (100). These migraines were constant. (100). To lessen the pain, Mr. Barteau took Tylenol, Aleve and Motrin during the day and amitriptyline, a prescription medication, at night to sleep. (100). These conditions resulted in Mr. Barteau not being able to do much. (100). His driving was limited and watching TV and reading caused migraines. (100).

33.     Also in September of 2004, Prudential reviewed Mr. Barteau's claim for disability benefits. (402). Prudential presumed that Mr. Barteau's right eye blindness alone "should not preclude (Mr. Barteau) from working." (402). Thus Prudential requested updated visual acuity notes from Dr. Aldave. (402).

34.     Prudential received two reports. The first, from a November 14, 2003 office visit, documented that Mr. Barteau was experiencing headaches with eye pain. (410). Mr. Barteau was to return in one year. (410). The second, from a September 17, 2004 office visit, documented that Mr. Barteau was experiencing frequent headaches which increased with eye strain. (409). It was again recommended that Mr. Barteau return the following year. (409).

35.     Prudential never again requested visual acuity notes from Dr. Aldave nor would Prudential ask Mr. Barteau for such information.

36.     Prudential requested updated treatment notes from Dr. Ruffin. (418). Prudential received these records in November 2004. (431).

37.     Having received this combination of records, Prudential determined that Mr. Barteau continued to be disabled under the terms of the Plan and thus disability benefits continued to be paid to Mr. Barteau. (440).

38.     On December 27, 2004, Prudential wrote to Mr. Barteau and informed him that on July 5, 2005 the definition of disability would change from the own job definition to the any job definition. (440). Thus, for Mr. Barteau to receive disability benefits from Prudential on and beyond July 5, 2005, Mr. Barteau needed to be unable to perform, for

wage or profit, the material and substantial duties of any job for which he was reasonably fitted by his education, training, or experience. (440). To determine if Mr. Barteau met this any job definition of disability, Prudential informed Mr. Barteau that it would conduct a "thorough evaluation to determine your eligibility for benefits to and beyond that date." (440).

39.    As part of the any job review, Prudential received from Allsup another functional capacity evaluation completed by Dr. Ruffin. (457). On January 24, 2005, Dr. Ruffin again documented that Mr. Barteau suffered from severe headaches which precluded the attention and concentration required for even simple, unskilled work tasks. (457). Along with the disabling cognitive impact caused by Mr. Barteau's headaches, Dr. Ruffin documented that Mr. Barteau suffered from disabling fatigue. (460).

**F.    Mr. Barteau is Awarded Social Security Disability Benefits Due to His Inability to Work in Any Occupation**

40.    On February 18, 2005, Allsup contacted Prudential with an update on Mr. Barteau's Social Security Disability appeal. (483). Allsup represented that it had submitted a written brief to the Office of Hearing and Appeals and was waiting for a hearing date. (484).

41.    On March 15, 2005, Allsup again contacted Prudential, this time informing Prudential that its efforts had been successful and Mr. Barteau had been awarded Social Security Disability benefits. (488). Mr. Barteau had been found to be disabled from any work. (488; 20 C.F.R. § 404.1520).

**G.    Prudential Determines Mr. Barteau is Disabled from Any Job**

42.    Having encouraged Mr. Barteau to pursue Social Security Disability benefits, Prudential did not indicate that it considered the Social Security Administration finding to be evidence of disability.  Rather, Prudential continued, in its own words, to "conduct[] a thorough evaluation to determine Mr. Barteau's eligibility for benefits" under the any job definition of disability. (485).

43.    On May 6, 2005, as part of this evaluation, Prudential referred Mr. Barteau's claim to a Vocational Rehabilitation Specialist, Douglas Palmer, MS, CRC, CDMS, for

evaluation of Mr. Barteau's employment options. (505). This review took into consideration Mr. Barteau's education and training along with his headaches, right eye blindness, and blurred vision in his left eye. (505). Vocationally, Prudential determined that Mr. Barteau "continues to have medical complications that would impact his ability to work." (505). It was Prudential's conclusion that Mr. Barteau "would not be able to identify employment options without extensive vocational intervention." (505). Prudential never again had Mr. Barteau's ability to work examined by a vocational specialist of any type and Mr. Barteau never underwent extensive vocational intervention.

44. On May 11, 2005, Prudential contacted Mr. Barteau and inquired how he was doing. (104). Mr. Barteau expressed that he "is alive" but was still getting headaches. (104). These headaches were constant "due to nerve damage in his eye." (104). To treat this pain, during the day Mr. Barteau got by using Tylenol and at night he took amytriptaline. (104).

45. On June 2, 2005, Prudential wrote to Mr. Barteau to express the results of Prudential's through evaluation of his continued eligibility for benefits against the any job standard of disability. (517). Prudential stated:

> We have completed our evaluation of your claim based on the definition of disability as stated above. We have determined that you meet the requirements for eligibility for benefits under this definition of disability. We have determined that you are totally disabled as required. Benefits will continue provided you remain totally disabled.... (517).

Prudential's plan for the administration of Mr. Barteau's claim was to follow up for continued updates and to "check for progress." (519). If *progress* was noted, then Prudential would re-visit the possibility of Vocational Rehabilitation Counselor services. (519). The facts in the record show that Prudential recognized Mr. Barteau was disabled from any job and would remain disabled absent "progress" (519) or "extensive vocational intervention" (505). The claim file is devoid of evidence that either of these events occurred.

46. The permanent nature of Mr. Barteau's disability caused his claim to be referred to Prudential's "Mature Unit for minimal handling." (520).

**H.   After Finding Mr. Barteau Disabled From Any Job, Prudential Terminates Mr. Barteau's Disability Benefits Without Evidence of Improvement or Progress**

47.   Prudential's next review came in March 2006, when Prudential determined an update on treatment was warranted "[a]lthough it appears[] there has been little or no change in EE's condition, it is somewhat unclear as to what are appropriate R+L's and possibility of improvement to work capacity when if ever." (522).

48.   Prudential asked Mr. Barteau to complete an activities of daily living questionnaire. (529).

49.   Mr. Barteau completed this questionnaire in April 2006. (538). Mr. Barteau stated that his current medical conditions included extremely bad headaches, blindness in his right eye, and blurred vision in his left eye. (531). He treated for headaches, neck aches, and shoulder aches. (531). His headaches caused him trouble with sleeping and he needed to take naps. (532). Mr. Barteau could drive, but was limited to distances of 2 miles or less, and for anything greater he used a bus service for the disabled or his fiancé. (533). Mr. Barteau did not perform any type of housework as this was performed by a cleaning woman and his fiancé. (534). Mr. Barteau did like to play the guitar, but he was no longer able to play for "more than just a few minutes." (535). Mr. Barteau had attempted working since his disability, but found that he could not work for more than 5 or 10 minutes due to headaches and blurred vision. (537).

50.   Prudential also requested medical records from Dr. Ruffin in May of 2006. Prudential specifically requested only the two most recent treatment records. (544). This created an artificial gap in Mr. Barteau's medical records of almost a year and a half. Prudential also sent Dr. Ruffin a "Work Status Form" for completion. (544).

51.   Unlike the Allsup forms, the questions Prudential asked on this form were not tailored to Mr. Barteau's conditions, which further created an information gap. (555). This generic form did not request information on Mr. Barteau's headaches, fatigue, or cognitive abilities, as had the tailored forms from Allsup. (555). The form addressed only physical abilities such as carrying, pushing, and pulling objects. (555). Thus, many of the

10

disabling aspects of Mr. Barteau's conditions went unaddressed when Dr. Ruffin completed the form in June 2006. (555).

52. When Prudential reviewed this limited form, Prudential formed the opinion that Mr. Barteau "has work capacity." (107).

53. On September 8, 2006, Prudential informed Mr. Barteau of this impression and advised him that there "is no objective evidence in file of any disabling condition…." (107).

54. The Plan does not contain the requirement that proof of disability be "objective." (1-49).

55. Mr. Barteau informed Prudential that in addition to Dr. Ruffin he was also seeing an orthopedic specialist for spine pain (which he believed was a result of nerve damage caused by the antibiotics Mr. Barteau took to treat his fungal infection), and was seeing a bio-feedback psychiatrist, Dr. Evan Landrum. (107). Prudential asked for proof of disability from all these treatment providers in 30 days or his claim would be terminated. (107).

56. Mr. Barteau attempted to comply with Prudential's request, however, the orthopedic specialist declined to comment on his disability until further treatment had been performed and Dr. Landrum stated he would not opine on disability unless he performed neuropsychological testing. (107).

57. On September 15, 2006, Prudential again reminded Mr. Barteau of its need for "something to objectively support his disability" if Prudential was going to continue paying his claim. (107). Prudential did not, and never would, offer examples of what type of information Prudential considered to constitute "objective support." Further, Prudential did not inform Mr. Barteau why objective support was now required when the LTD Plan did not require objective evidence. Prudential had found Mr. Barteau to be disabled for the prior three years when, in Prudential's words, there was "no objective evidence" to support this finding. (107).

58.     Mr. Barteau obtained medical records from Dr. Ruffin, scheduled further treatment with the orthopedic specialist, and provided documentation that he had developed a mood disorder, generalized anxiety, and cognitive dysfunction due to his severe head pain. (560-65).

59.     On October 3, 2006, Mr. Barteau informed Prudential that he was to undergo neuropsychological testing which would commence that day, and that he was going to undergo three MRI's the following day to evaluate his spine. (108). In response, Prudential stated it "would gladly work with him to allow for necessary time to obtain all pertinent info prior to any decision.  He thanked me repeatedly." (108).

60.     On October 5, 2006, Dr. Landrum wrote to Prudential and informed them that Mr. Barteau was currently undergoing a neuropsychological evaluation to determine the extent of his reported disabilities and his ability to function due to blindness in one eye, severe headaches, anxiety and depression. (567). Dr. Landrum indicated that he would forward the findings of the neuropsychological evaluation when it was completed, but the evaluation had to be conducted in stages as Mr. Barteau "becomes quickly fatigued because of his constant headaches." (567).

61.     Contrary to its express assurances, Prudential did not wait for the results of the neuropsychological evaluation or the MRIs before it commenced the evaluation of Mr. Barteau's claim and made the decision to terminate his benefits. (108).

62.     On October 9, 2006, six days after telling Mr. Barteau that it would allow the necessary time to obtain the pertinent information Prudential knew was forthcoming, Prudential reviewed the available records (which did not include the evidence Mr. Barteau was obtaining) and determined that Mr. Barteau's blindness and headaches did not provide restrictions or limitations impacting his functional capacity. (569). Prudential felt it was "[u]nclear exactly what (Mr. Barteau) is suffering from currently. He has had multiple conditions in the past that seem to have resolved...." (570).

63.     There existed no evidence in the claim file that any of the conditions Prudential had previously deemed disabling had resolved or gone away. In fact, there was some evidence showing the opposite. (531, 556, 560, 562, 564, 567).

64.     Mr. Barteau continued to suffer from all prior disabling conditions and symptoms, and he had undergone an MRI which showed he also suffered from bulging discs in his cervical spine. (580).

65.     By letter dated October 25, 2006, after having deemed Mr. Barteau to be totally disabled for almost four years, and without the neuropsychological or MRI testing it knew was forthcoming shortly, Prudential terminated Mr. Barteau's benefits. (592). Prudential based the termination on the conclusion that "[b]ased on conditions noted above, it is unclear what is restricting you from your light work activities." (596). After four years of deeming him totally disabled, and without any evidence of improvement, Prudential found Mr. Barteau to be able to work.

**I.     Neuropsychological Testing Proves Mr. Barteau is Cognitively Impaired by Pain and Unable to Work in Any Job**

66.     No later than November 4, 2006, Prudential received the neuropsychological evaluation of Mr. Barteau. (608).

67.     As noted, Prudential was aware the neuropsychological evaluation had commenced on October 3rd (evaluations stopped on October 18th), but Dr. Landrum's report was not completed until October 30, 2006. (621). In Dr. Landrum's report he documented the results of the testing he had performed on Mr. Barteau. (621). Based on objective test results and personal observation, Dr. Landrum found that it was "apparent that Mr. Barteau's cognitive and physical functioning is severely affected by his chronic, debilitating headaches." (621).

68.     Dr. Landrum documented that Mr. Barteau attempted to give his best at every task, however, Dr. Landrum observed that Mr. Barteau's "ability to function changes dramatically as headache pain increased or decreased and/or he felt rested enough to attempt to ignore the pain." (610).

69.     In performing the tests, Mr. Barteau would work for as long as possible, but would have to lie down and rest every 20 minutes or so. (610). Pursuant to his observation, it was apparent to Dr. Landrum that on many occasions Mr. Barteau was struggling to concentrate and focus on the task at hand. (610).

70.     These observations supported the accuracy of the objective tests administered by Dr. Landrum. (611). All of the objective test scores were valid, except for the visual stimuli testing, which was invalid due to Mr. Barteau's visual problems. (617).

71.     The test results showed that Mr. Barteau was "extremely impaired" in his ability to regulate his responses and respond to stimuli appropriately. (617). Mr. Barteau was "extremely impaired" in his auditory attention, limiting his ability to make accurate responses, stay focused and sustain his attention even under low demand conditions. (617). Mr. Barteau was "extremely impaired" in his ability to be flexible when things change under high demand conditions. (617). The testing showed Mr. Barteau was likely to overreact to and/or be distracted by auditory stimuli in his environment; indicative of problems shifting mental sets and inhibiting his responses to changes in environments. (617). These findings showed that Mr. Barteau was likely to have "significant functional problems in his life." (617).

72.     The objective testing showed that Mr. Barteau was likely to have difficulties learning new tasks in the work environment. (617). Mr. Barteau demonstrated erratic information processing and a delay in his optimum response time which was likely to significantly impact his ability to process information. (617). The testing showed Mr. Barteau had significant problems with his general auditory attentional functioning which was "likely to have a major impact on his ability to perform successfully in many areas of his life....[c]onsequently, he is likely to have problems in the work environment in maintaining his auditory attention...." (618). Once distracted, the objective tests showed that Mr. Barteau had problems being able to quickly get "back on track." (618). This was a problem for Mr. Barteau because the testing showed he frequently "drifted off." (618).

73.     The types of problems the tests showed Mr. Barteau suffered from were "likely to manifest in the school or work environment as difficulty following directions accurately and/or the misunderstanding of verbal instructions." (618). The objective testing reflected a very slow mental processing speed. (618). Mr. Barteau was likely to be extremely impaired in his ability to listen to and comprehend instructions, recall verbal information, take accurate and detailed notes in meetings, and understand key information during conversations. (618-19).

74.     Based on the objective testing Dr. Landrum determined that, "[i]n the work setting, (Mr. Barteau) may have difficulty getting assigned tasks done on time." (619). Mr. Barteau showed difficulty setting priorities, staying on task, and following work through to completion. (619). When pressed to perform, Mr. Barteau was not likely to respond well. (619).

75.     The MicroCog subtests indicated "strong support" for Mr. Barteau's problems with general cognitive functioning and proficiency, including slowed information processing, accuracy and spatial processing, as well as "severe" problems with attention and reaction time. (619).

76.     The Trail-Making Test showed that Mr. Barteau also had "significant problems with visual attention and speed of visual processing." (620). These problems showed that Mr. Barteau "will have problems working effectively in employment settings." (620).

77.     Mr. Barteau's Pin Test indicated major problems with his motor speed. (619).

78.     Dr. Landrum's diagnosis was that Mr. Barteau suffered from the physical pathology (Axis III) of Migraine/Cluster Headaches, Severe, which caused the mental pathology (Axis I) of Cognitive Disorder and Mood Disorder. (621). Dr. Landrum determined that Mr. Barteau suffered from "Occupational Problems." (621).

79.     Considering all the objective test results and his personal observations, Dr. Landrum formed the conclusion that:

It seems apparent that Mr. Barteau's cognitive and physical functioning is severely affected by his chronic, debilitating headaches.  He has learned to live with the headaches, but must give much time and effort to working around them and in keeping them from isolating him from family and the world in general.

…

It is my opinion, given the results of these assessment instruments that Mr. Barteau cannot at this time maintain enough focus for a long enough period to satisfy virtually any requirements for work or work-like situations.  It is unlikely that this will change as long as he cannot reduce his headaches. (621).

80.     Dr. Landrum's findings and conclusions were based on objective test results. (608-21).

**J.     Prudential Uses its Own Reviewers to Review the Objective Neuropsychological Test Results**

81.     Without a formal appeal from Mr. Barteau, Prudential had Dr. John LoCascio review Dr. Landrum's report. (650).

82.     Dr. LoCascio addressed Mr. Barteau's headaches, but concluded that the only place the headaches were mentioned was in Dr. Landrum's report. (653). Dr. LoCascio felt there was "no support" for the severity of the headaches, or for "any impairment" related to the headaches, other than that contained in Dr. Landrum's objective neuropsychological data. (653). Dr. LoCasico seemed to simply dismiss Drs. Aldave and Ruffin's multiple statements regarding the existence and severity of Mr. Barteau's headaches. (399, 409-10, 457). Moreover, Dr. LoCascio did not address why Dr. Landrum's objective findings and observations were not sufficient support for impairment due to headaches. Dr. LoCascio did state that the "data indicate[s] significant impairment on the basis of one interview and testing done on 10/18/06…." (653-54). Dr. LoCascio concluded that this was a complex case and referred the case *by name* to a Dr. Stephen N. Gerson. (654).

83.     Prudential followed Dr. LoCascio's direction and sent Mr. Barteau's file for review to Dr. Gerson, psychiatrist. (689).

84.     On December 22, 2006, Dr. Gerson sent his review findings to Prudential. (676). Dr. Gerson had reviewed the records and found that Dr. Joseph Peck's records

16

documented disk bulges and spurs in Mr. Barteau's cervical spine and Dr. Ruffin's records documented Mr. Barteau's headaches were severe, which precluded attention and concentration for even simple unskilled work tasks, and that these migraine headaches were occurring frequently. (682). Dr. Gerson recognized that Mr. Barteau "remained out of work due to reported daily 'migraine' and 'cluster' headaches, which reportedly interfered with his ability to adequately pay attention and concentrate, and caused extreme fatigue." (686). Yet Dr. Gerson went on to say "[i]n general, medical records…did not note that the claimant reported or demonstrated any…substantial difficulty with concentration and attention." (688).

85.    It cannot be discerned from the record what Dr. Gerson felt Dr. Ruffin's records and the neuropsychological evaluation reported or demonstrated as those reports directly demonstrated Mr. Barteau's substantial difficulty with concentration and attention.  This becomes clear as when Dr. Gerson spoke to the results from the tests performed during the neuropsychological evaluation, he stated: "all scores…fell into the extremely impaired range, which is incompatible with medical record documentation." (688).

86.    Dr. Gerson's perceived incompatibility (Prudential and Social Security had already found Mr. Barteau to be disabled from any job based on the medical record documentation in existence before the neuropsychological evaluation) cannot be reconciled with the objective, medical evidence in the Administrative Record.  Plaintiff has offered evidence that Dr. Gerson is not an independent medical reviewer.  Rather, an internet search of Dr. Gerson shows he broadcasts that he "has done over 1500 Psychiatric Disability File reviews for Disability Insurance Companies such as Prudential." [http://www.jurispro.com/stephengerson] Plaintiff also has provided information purportedly showing that, in the past, Dr. Gerson has shown that his motivation is not to facilitate a fair evaluation of a claimant's disability, but to facilitate not paying a claim. *See* Plaintiff's Supplemental Initial Disclosures, Exhibit "A" at PID 004 ("[Dr. Gerson] said if we do that we run the risk that they will find a doctor who will

17

1 be an advocate....he said he will not put these suggestions in the report from the
2 information that he has ee is not impaired.").

3    87.    Five days after sending Prudential his file review findings Dr. Gerson called
4 Dr. Landrum to discuss Mr. Barteau's disability. (670). In this forty-five minute
5 conversation, Dr. Gerson confirmed that Mr. Barteau was in fact providing full effort
6 during the neuropsychological evaluation and that Mr. Barteau was not a malingerer.
7 (670). Dr. Gerson was also informed that Dr. Landrum treats Mr. Barteau weekly for
8 biofeedback and pain management. (671). Having commenced this weekly treatment, Dr.
9 Landrum felt Mr. Barteau was impaired by a combination of pain and depression, with
10 the depression being an outgrowth of the chronic pain. (671).

11    88.    Dr. Gerson's opinion following the conversation was that he "[did] not think
12 (Mr. Barteau was) disabled by depression alone," and "claimant needs a consultation with
13 a psychologist who is an expert on management of chronic pain." (668). Dr. Gerson did
14 not dispute that Mr. Barteau was experiencing disabling pain, and Dr. Gerson went so far
15 as to postulate that Mr. Barteau may benefit from "a low dose of opiate" (668) and "needs
16 more aggressive pain...management." (669).

17    89.    Following the prolonged conversation with Dr. Landrum, the most Dr.
18 Gerson was willing to assert was his observation that the neuropsychological testing was
19 not validated by specific alternative testing. (668). Significantly, even though the validity
20 testing Dr. Gerson noted as having not been performed, Dr. Gerson's opinion was that
21 he was "not convinced psychological testing needs to be repeated." (668). Thus, Dr.
22 Gerson opined: "I don't feel (Mr. Barteau's) level of depression alone is substantially
23 impairing the claimant at this point." (669).  Mr. Barteau had never claimed, nor had
24 Prudential previously determined, that Mr. Barteau was substantially impaired by
25 depression alone.

26    **K.    Mr. Barteau Continues to Treat for His Disabling Conditions and
         Appeals Prudential's Termination by Providing to Prudential the
27         Opinions of Three Treating Doctors That Mr. Barteau is Disabled from
         Any Job**

28

90.     As Prudential was performing its review of the neuropsychological evaluation, Mr. Barteau was treating with Dr. Landrum, Dr. Ruffin and Dr. Joseph C. Peck, Board Certified Pain Medicine & Board Certified Physical Medicine and Rehabilitation. On January 23, 2007, Prudential informed Mr. Barteau that he had not provided a formal appeal. (701).

91.     Prudential received the formal appeal from Mr. Barteau on February 10, 2007.[2] (110). Mr. Barteau enclosed with his appeal letters from Drs. Peck, Landrum, and Ruffin, all of which supported Mr. Barteau's inability to work any job. (628).

92.     On December 15, 2006, Dr. Peck wrote that "Mr. Barteau has been under my care since September 28, 2006 for complaints of chronic severe headaches, neck pain, right arm pain, low back pain, and right leg pain." (664). Dr. Peck noted that Mr. Barteau had undergone an MRI of the cervical spine which demonstrated multilevel disc herniations, and an MRI of the lumbar spine which demonstrated a right lateral disc herniation. (664). Mr. Barteau had also been the subject of electrodiagnostic studies of the upper extremities, which demonstrated acute cervical radiculopathy and electrodiagnostic studies of the lower extremities showed chronic right lumbar radiculopathy. (664). Based on this objective and subjective evidence, Dr. Peck stated "[i]n my opinion, this patient continues to suffer from severe and incapacitating headache, neck pain, low back pain, and leg pain that interferes with his ability to perform any type of work at this point in time." (665).

93.     Dr. Landrum's January 15, 2007 letter reiterated his findings from the neuropsychological testing and responded to Dr. Gerson's conversation. (694). Dr. Landrum stated that Mr. Barteau sought the neuropsychological testing because Mr. Barteau had been told that he was not disabled and would be losing his disability compensation. (694). Dr. Landrum pointed out that the testing was done to support Mr.

_____

[2] Mr. Barteau's formal appeal letter is erroneously dated November 9, 2006.  There is no indication that this is an accurate date and information provided with the appeal letter post-dates this clearly erroneous date.

1  Barteau's claim of disability, not to establish one. (694). Dr. Landrum clarified that Mr.

2  Barteau's

3     pain is so severe that it takes all of his effort to have limited periods of
       functionality during the day.  It is during these very brief periods that he
4      tries to take care of financial matters or other matters of import.  He depends
       on his fiancé to review anything important before he makes decisions.
5      Much of his time is spent lying down or isolated from others because he is
       in such pain that he cannot even hold a conversation. (694).

6  Dr. Landrum's opinion, following weekly treatment, was that until Mr. Barteau's pain

7  was brought under control "Mr. Barteau will not be able to function cognitively in a

8  manner that will allow him to hold any kind of job that requires even a minimum of

9  attention and concentration for longer than a few minutes at a time." (695).

10        94.    On January 26, 2007, Dr. Ruffin wrote:

11     Mr. Barteau has been a patient of mine for several years.  Over the past few
       years Mr. Barteau has shown increased depression, decreased ability to
12     concentrate, increased headaches, trouble focusing, increased neck and back
       pain secondary to herniated discs.  I believe it would be very difficult for
13     Mr. Barteau to maintain a consistent work performance. (703).

14        95.    Prudential also obtained substantial amounts of treatment records. These

15  records continued to document Mr. Barteau's reports of and treatment for high pain and

16  poor cognitive function. (e.g. 623, 648, 658, 721).

17        96.    The continued treatment for Mr. Barteau's pain included a prescription for

18  an opioid, Propoxy (a form of Darvocet), and referral to a new pain management

19  specialist, Dr. Kamran Ghadimi. (880, 884).

20        **L.    Prudential Has A Doctor Review Some of Mr. Barteau's Medical Records**

21        97.    Prudential had portions of Mr. Barteau's records reviewed by Dr. Joyce

22  Bachman. (722). Dr. Bachman only reviewed medical records back to October of 2006

23  and came to the conclusion that

24     [t]he primary complaint is headache pain for which the claimant is seeing
       pain mgt weekly. So the frequency is more than usual for headaches.
25     However the level of care is inconsistent with the alleged severity of
       symptoms by his providers and the claimant." (723).

26  Dr. Bachman did not clarify why headache pain treatment that was more than usual

27  would support any other conclusion than the fact that the severity of Mr. Barteau's

28  headache pain symptoms were more than usual. What is evident is that for Dr. Bachman -

1  Prudential's Medical Director - weekly pain management treatment was not frequent

2  enough treatment to substantiate severe symptoms.

3  **M.   Prudential Has a Reviewing Agency Review Mr. Barteau's Medical Records**

4  98.   Following Dr. Bachman's review, Prudential sent Mr. Barteau's medical

5  records to MLS National Medical Evaluation Services Inc. ("MLS") for an "independent"

6  review. (730).

7  99.   Plaintiff has submitted evidence of MLS's possible bias, including

8  deposition testimony which alleges that in the past MLS has altered medical reports to

9  support denying a claim. (990-1122).

10  100.   Dr. Gill Lichtshein, performed the review for MLS. (730). Dr. Lichtshein

11  reviewed Mr. Barteau's responses contained in the neuropsychological testing and opined

12  that "[o]bservations and results of the assessment appeared to be an accurate description

13  of the claimant's current level of functioning." (737). Dr. Lichtshein went on to state:

14  "Though neuropsychological testing indicated that the claimant had difficulties and

15  struggles with concentrating, no objective evidence of substantial cognitive function was

16  delineated." (745). Dr. Lichtshein did not offer what type of evidence constituted

17  "objective evidence" of cognitive function to him nor did Dr. Lichtshein delineate why

18  this purported subjective evidence (which he deemed to be accurate) was not sufficient

19  to support disability.

20  101.   MLS's Jack Denver, Physical Medicine and Rehabilitation, also performed

21  a review of the records. (758). Dr. Denver restricted his assessment to physical

22  functioning, without consideration of Mr. Barteau's ophthalmological dysfunction. (762).

23  With this narrow focus, Dr. Denver concluded, "[a]s it related to physical functioning

24  particularly in relation to Mr. Barteau's complaints of headaches, chronic neck and low

25  back pain and arm and leg pain, the available medical records as described…do not

26  support that as of November 1, 2006 he is in any way impaired physically." (763). Dr.

27  Denver made clear that he was not offering an opinion on Mr. Barteau's cognitive

28  functionality as Dr. Denver specified his assessment related to "sitting, standing, walking,

lifting, carrying, pushing, pulling, reaching, and/or performing repetitive and fine motor hand activities." (763). Dr. Denver also evaded the question regarding Mr. Barteau's "self-reported chronic pain." (764). Dr. Denver recognized the continual documentation of Mr. Barteau's complaints and treatment for pain, but felt that "[d]espite his self reported chronic pain complaints, there was no objective findings supporting the presence of chronic pain complaints." (764).

102. It is axiomatic that pain is subjective and often cannot be objectively verified.

**N. Based on its Own Reviews, Prudential Upholds the Termination of Mr. Barteau's Benefits**

103. By letter dated June 30, 2007, Prudential upheld the termination of Mr. Barteau's benefits on appeal. (777). This termination letter quoted block passages from the reviews performed by Drs. Bachman, Lichtshein, and Denver. (778-79). There is no evidence Prudential considered any other evidence other than these reviews. (777-80). Further, Prudential did not offer any explanation as to what type of evidence Prudential deemed necessary to perfect Mr. Barteau's claim. (777-80).

**O. Mr. Barteau Appeals and Again Presents Significant, Reliable and Objective Evidence of His Continued Disability**

104. On January 25, 2008, Mr. Barteau appealed Prudential's determination with the help of Kantor & Kantor. (1137).

105. Included with his appeal, Mr. Barteau provided documentation of at least 45 individual office visits to treat his disabling pain, headaches, shoulder and spine related conditions. (e.g. 708-09, 719-21, 726-28, 771, 960). These visits documented treatment for 15 months from November 2006 through January 2008, including multiple cervical and lumbar epidural steroid injections and facet blocks under fluoroscopy. (785, 801, 811, 814, 827).

106. In a letter dated December 6, 2007, Dr. Landrum confirmed that Mr. Barteau's condition and functional capacity had not changed. (1124). Mr. Barteau remained unable to focus and/or concentrate long enough to become employed. (1124).

107. On January 23, 2008, Dr. Ghadimi assessed Mr. Barteau's spinal condition. (979). Dr. Ghadimi asserted that Mr. Barteau was not a malingerer, that Mr. Barteau's symptoms and functional limitations were reasonably consistent with Mr. Barteau's physical evaluations, and that Mr. Barteau could sit/stand/walk for two hours each in an eight hour work day. (976).

108. Mr. Barteau provided testimonial letters from his daughter, Laurie Bunch, and fiancé, Marilyn Amato. (1130-32).

109. Ms. Bunch observed that Mr. Barteau "had to constantly deal with his visual and physical disabilities as well as dealing with constant pain management." (1130). Ms. Bunch also confirmed Mr. Barteau's limited life-style:

> He cannot work on the computer, watch television or even watch my two children (ages 1 and 4) for more than an hour because he would then have to spend hours everyday recovering from the strain and pain that would result from the activity. My dad spends at least 8 to 10 daytime hours everyday resting and dealing with constant pain–laying on heating pads, doing his physical therapy movements, and sleeping. (1130).

110. Ms. Amato observed and experienced the same. Since Mr. Barteau's release from the hospital to treat his eye,

> He has not been the same. He has been in constant pain through out his whole body. He has complained of constant head aches and body aches and he continually takes various medications to try and relieve his constant pain....He would take medication and then rest six to eight times a day with heat on his neck and shoulders and back for 20 to 30 minutes at a time. He still is trying to control the pain with pills and the heat. He still has, at this present time, excruciation head aches, back, arm, shoulder and neck pain. (1131).

**P.** **Prudential Again Relies on the Same Reviewers to Uphold the Termination of Benefits**

111. Prudential had Drs. Lichtshein and Denver review the documents submitted on the second appeal.

112. Dr. Lichtshein's opinion was not altered. (1156).

113. Prudential paid $1,260.00 for Dr. Lichtshein's additional opinion. (1173).

114. Dr. Denver's opinion was altered, but only to include restrictions and limitations on the basis of cervical range of motion impairments. (1162). Dr. Denver

1  concluded these new restrictions and limitations "would not prevent sustainable work
2  capacity." (1163).

3      115.   Prudential paid $2,380.00 for Dr. Denver's additional opinion. (1176).

4      116.   In performing the second appeal, Prudential considered only Drs. Lichtshein
5  and Denver's additional opinions and did not have Mr. Barteau's claim reviewed by a
6  vocational specialist to determine if he was able to return to work. (1169).

7      117.   In a letter dated March 21, 2008, Prudential upheld the termination of Mr.
8  Barteau's benefits. (1166).

9      118.   On April 25, 2008, Mr. Barteau filed a Complaint with this Court seeking
10 review of Prudential's termination of Mr. Barteau's long term disability benefits.

11     **Q.   Summary and Factual Conclusions**

12     1.   Prior to the onset of headaches and pain, Mr. Barteau had been a Professor
13 of Mathematics; when Prudential terminated Mr. Barteau's disability benefits Prudential
14 deemed Mr. Barteau capable of returning to this occupation, and thus any occupation as
15 well. (1168).

16     2.    Prudential's termination of benefits, and Prudential's upholding that
17 termination through the appeals, is not supported by the weight of the evidence in the
18 record.  Mr. Barteau remained disabled under the terms of the Plan.

19     3.   The neuropsychological examination showed that Mr. Barteau's ability to
20 regulate his responses and respond to stimuli appropriately was defective, as was his
21 ability to make accurate responses, stay focused and sustain his attention even under low
22 demand conditions.  The neuropsychological examination also showed that Mr. Barteau
23 was likely to have difficulties learning new tasks in the work environment and he
24 demonstrated erratic information processing along with delay in his optimum response
25 time.  These dysfunctions were likely to significantly impact his ability to process
26 information.  Mr. Barteau had significant cognitive problems which were likely to have
27 a major impact on his ability to perform successfully in many areas of his life.
28

1   Consequently, Mr. Barteau was likely to have problems in the work environment in
2   maintaining his auditory attention. (617-18).

3        4.      For Mr. Barteau, his cognitive dysfunction was likely to manifest in the
4   school or work environment as difficulty following directions accurately and/or the
5   misunderstanding of verbal instructions. Mr. Barteau demonstrated a very slow mental
6   processing speed and he was likely to be extremely impaired in his ability to listen to and
7   comprehend instructions, recall verbal information, take accurate and detailed notes in
8   meetings, and understand key information during conversations. (617-19).

9        5.      Based upon the neuropsychological examination, it is apparent to the Court
10  that Mr. Barteau's cognitive and physical functioning was severely affected by his
11  chronic, debilitating headaches. Simply put, the evidence showed Mr. Barteau was not
12  able to maintain enough focus for a long enough period to satisfy virtually any
13  requirements for work or work-like situations.

14       6.      The Court finds the neuropsychological testing was valid, presented an
15  accurate description of Mr. Barteau's level of functioning, and verified that Mr. Barteau
16  continued to meet the Plan's definition for disability when Prudential wrongfully
17  terminated Mr. Barteau's disability benefits. The Court finds support for this conclusion
18  both from reviewing the neuropsychological test report and from the physicians who
19  reviewed the report. Dr. Lichtshein stated that the "[o]bservations and results of the
20  assessment appeared to be an accurate description of the claimant's current level of
21  functioning;" (737) and that "neuropsychological testing indicated that the claimant had
22  difficulties and struggles with concentrating." (745). Dr. LoCascio stated that the
23  neuropsychological "data indicate[s] significant impairment." (653). Dr. Landrum stated
24  that these results "appear to be an accurate description of [Mr. Barteau's] current level
25  of functioning." (611).

26       7.      The Court finds the neuropsychological examination was alone sufficient for
27  a finding that Mr. Barteau continued to be disabled when Prudential terminated his
28

25

benefits; however, the Court finds additional evidence supported Mr. Barteau's continued disability.

8.     Prior to, and following the termination of benefits, Dr. Peck, who is Board Certified in Pain Medicine and Physical Medicine and Rehabilitation, had been treating Mr. Barteau for complaints of chronic severe headaches, neck pain, right arm pain, low back pain, and right leg pain. In treating Mr. Barteau's pain, Dr. Peck performed a diagnostic work up. Based on the findings from the diagnostic work up and Dr. Peck's personal experience treating Mr. Barteau, Dr. Peck determined Mr. Barteau continued to suffer from severe and incapacitating headache, neck pain, low back pain, and leg pain that interfered with Mr. Barteau's ability to perform any type of work. (664-65). The Court finds Dr. Peck's determinations to be credible, supported by the evidence in the record, and an accurate description of Mr. Barteau's functional capacity.

9.     Dr. Ruffin, who had been treating Mr. Barteau for several years both prior to and following the termination of benefits, was able to personally observe fluctuations in Mr. Barteau's abilities. Based on Dr. Ruffin's treatment and longstanding personal knowledge of Mr. Barteau, Dr. Ruffin observed that in the years leading up to the termination of benefits, Mr. Barteau had shown a decreased ability to concentrate, increased headaches, trouble focusing, and increased neck and back pain secondary to herniated discs. Based on this longstanding treatment, Dr. Ruffin determined it would be very difficult for Mr. Barteau to maintain a consistent work performance. (703). The Court finds Dr. Ruffin's continuous determinations to be credible, supported by the evidence in the record, and an accurate description of Mr. Barteau's functional capacity.

10.    Dr. Landrum, who began treating Mr. Barteau on a weekly basis contemporaneously with the termination of benefits, assessed and diagnosed Mr. Barteau as suffering from problems with cognitive functioning due to severe pain. Dr. Landrum described Mr. Barteau's pain as relentless and so severe that it took all of Mr. Barteau's effort to have limited periods of functionality during the day. Mr. Barteau's chronic pain exacerbated all other problems in Mr. Barteau's life. After a year of treating Mr. Barteau

1  on a weekly basis, Dr. Landrum documented Mr. Barteau's prognosis had not changed
2  significantly. (694, 1124). The Court finds Dr. Landrum's determinations to be credible,
3  supported by the evidence in the record, and an accurate description of Mr. Barteau's
4  functional capacity.

5       11.    Dr. Ghadimi asserted that Mr. Barteau was not a malingerer, that Mr.
6  Barteau's symptoms and functional limitations were reasonably consistent with Mr.
7  Barteau's physical evaluations, and that Mr. Barteau could sit/stand/walk for two hours
8  each in an eight hour work day. (976). The Court finds Dr. Ghadimi's determinations to
9  be credible, supported by the evidence in the record, and an accurate description of Mr.
10 Barteau's functional capacity.

11      12.    This summary, as well as the Court's other findings, reveal that defendants
12 had ample and compelling evidence of Mr. Barteau's disability as defined by the Plan on
13 and after October 26, 2006.

14      13.    The only support for defendants' position comes not from affirmative
15 medical evidence, but rather reviews of the medical records performed by various nurses
16 and physicians.  The Court does not find these reviews, or the opinions expressed therein,
17 to overcome the evidence in the record supporting Mr. Barteau's continued disability
18 under the Plan's terms.

19      14.    To the extent there exists conflicting opinions of the medical practitioners
20 with regard to Mr. Barteau's functional capacity, the Court gives the greatest weight to
21 Drs. Ghadimi, Landrum, Peck, and Ruffin, who have spent some amount of time with Mr.
22 Barteau, performed diagnostic tests on Mr. Barteau, and had the opportunity to assess Mr.
23 Barteau's symptoms over time.  The determinations of these Doctors are consistent with
24 regard to the symptoms Mr. Barteau experienced as well as the effect that those
25 symptoms would have on Mr. Barteau's ability to perform any occupation.

26      15.    The Court notes that the only vocational assessment of Mr. Barteau's
27 employability found Mr. Barteau would not be able to identify employment options
28 without extensive vocational intervention.  The record does not reflect that Mr. Barteau

underwent extensive vocational intervention, further evidence that Mr. Barteau remained disabled when Prudential terminated Mr. Barteau's benefits.

16.    The clear weight of the evidence under the *de novo* standard therefore establishes Mr. Barteau's disability under the terms of the Plan, which is whether, due to the same sickness or injury, Mr. Barteau was unable to perform the duties of any gainful occupation for which Mr. Barteau was reasonably fitted by education, training or experience.

17.    Accordingly, the Court concludes that Mr. Barteau met the definition of disability under the Plan at the time that his benefits were terminated effective October 26, 2006.  Therefore, Prudential's decision to terminate benefits was wrongful, as was Prudential's upholding that decision on appeal.

18.    Mr. Barteau is entitled to reinstatement of his benefits for the period from October 26, 2006 until the date of judgment.

19.    Mr. Barteau is entitled to continued payment of those benefits for as long as is appropriate under the Plan.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction And Venue

1.    This action involves a claim for long term disability benefits under an employee welfare benefit plan regulated by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  As such, the Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132 (e). *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2346 (2008).

2.    Venue in the United States District Court for the Central District of California is invoked pursuant to 29 U.S.C. § 1132 (e)(2).  The parties do not dispute the facts requisite to federal jurisdiction or venue.

### B.    Standard of Review

3.    Plaintiff and defendants agree that the applicable standard of review is that of *de novo*; the default under ERISA. Def. Opening Trial Brief at 16:14-18; Plaintiff's

1    Opening Trial Brief at 21:15-17; *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343,

2    2348 (2008).  The Court finds this standard of review appropriate and will review the

3    claims decision under a *de novo* standard of review.

4         4.    In a *de novo* review, the Court undertakes an independent and thorough

5    inspection of the administrator's decision without affording any deference at all to the

6    plan administrator's decision. *Silver v. Executive Car Leasing Long-Term Disability Plan*,

7    466 F.3d 727, 728 (9th Cir. 2006). The Court will ask whether plaintiff is disabled within

8    the terms of the policy, and after evaluating the persuasiveness of conflicting evidence,

9    decide which is more likely to be true. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095

10   (9th Cir. 1999) (*en banc*).

11        5.    Following the termination of his benefits, Mr. Barteau submitted evidence

12   that he remained disabled as defined by the Plan.  (*e.g.* 609-21, 664-5).  Therefore, on *de*

13   *novo* review, Mr. Barteau has already made a strong showing that he was disabled and

14   entitled to continuing disability benefits under the Plan. *See Levinson v. Reliance*

15   *Standard Ins. Co.*, 245 F.3d 1321, 1331 (11th Cir. 2001) (holding that once claimant

16   makes *prima facie* showing of disability burden is on insurance company to produce

17   evidence showing that claimant was no longer disabled); *Gunderson v. W.R. Grace & Co.*

18   *Long Term Disability Income Plan*, 874 F.2d 496, 498-500 (8th Cir. 1989) (after benefits

19   had been paid under the any occupation definition of disability the court looked to see if

20   there was substantial evidence to support the determination that claimant was no longer

21   totally disabled); *Onofrieti v. Metropolitan Life Ins. Co.*, 320 F.Supp.2d 1250, 1254

22   (M.D.Fla. 2004) (holding the *Levinson* court did not shift the burden "because the

23   defendant had been paying benefits previously, but because the plaintiff had presented

24   evidence that he met the definition of disabled under the plan.").

25        6.    Upon *de novo* review of the entire record, the Court finds that the evidence

26   Prudential relied upon is not sufficient to overcome the evidence in the record which

27   supports Mr. Barteau's continued disability on and beyond Prudential's termination of

28   benefits.  The weight of the evidence in the record was sufficient to find that Mr. Barteau

1    continued to be disabled as defined by the Plan on and beyond October 26, 2006, the date

2    Prudential's termination became effective.  (593, 609-21, 664-5).

3    **C.    Consideration Of Evidence "Outside The Record" Is Appropriate Under The *De Novo* Standard Of Review**

4    7.    In Mr. Barteau's Opening Trial Brief, the Court's attention was directed to

5    information not contained in the record, but known to Prudential - evidence that

6    Prudential knew Dr. Gerson was biased in Prudential's favor.  Plaintiff's Opening Trial

7    Brief at 15:19-23.  While this information was not technically in the record generated,

8    compiled and produced by Prudential in this action, this information was certainly before

9    Prudential when it was administering Mr. Barteau's claim.  This information was either

10   generated by or directly involved Prudential.  In the Court's discretion, such information

11   from outside the record may be considered.  *Mongeluzo v. Baxter Travenol Long Term*

12   *Disability Ben. Plan*, 46 F.3d 938, 943-944 (9th Cir. 1995).

13   8.    Under the *de novo* standard of review, the Court, in its discretion, is allowed

14   to consider evidence "that was not before the plan administrator," *Id.*  Moreover, when

15   the evidence in question pertains to the bias of the reviewing physician, such evidence

16   is permitted under a *de novo* standard of review.  *Opeta v. Northwest Airlines*, 484 F.3d

17   1211, 1217 (9th Cir. 2007) (Extrinsic evidence is permitted in a *de novo* case where there

18   are issues regarding the credibility of a medical expert).  However, the information Mr.

19   Barteau proffered regarding the known bias of Dr. Gerson was not only known to

20   Prudential, it was *generated* by Prudential.

21   9.    The information offered by Mr. Barteau calls into question whether Dr.

22   Gerson provided full and fair assessments of the evidence, or whether he was an advocate

23   for Prudential.   Reliance on such skewed assessments renders any determination

24   unreliable, whether made by Prudential or a reviewing court, and therefore this Court has

25   considered the evidence offered by Mr. Barteau regarding Dr. Gerson to the extent it

26   reflects the bias and credibility of Dr. Gerson.

27   **D.    Mr. Barteau Continued to be Disabled Under the Terms of the Plan when Prudential Terminated His Disability Benefits**

28

10.    The Ninth Circuit has made clear that to justify a termination decision, one would expect to see an improvement in a claimant's medical condition.  *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) ("In order to find [a claimant] no longer disabled, one would expect the [medical records to show *improvement*, not a lack of degeneration"); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments"); *see Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794, 798-9 (9th Cir. 1997) (citing termination of claim where there has been no significant change in the claimants conditions as material, probative evidence of the existence of self serving termination of benefits)..

11.    Without any improvement in the symptoms Prudential had already determined made Mr. Barteau disabled from any occupation (particularly his headaches, fatigue and difficulty concentrating due to pain), Prudential determined that Mr. Barteau no longer met the definition of disability under the Plan and Prudential terminated Mr. Barteau's disability benefits.  Prudential's determination is not supported by the weight of the evidence in the record, and the Court finds Mr. Barteau remained disabled under the terms of the Plan.

12.    Maintaining employment in any occupation requires more than physical ability, it also requires cognitive abilities - Mr. Barteau lacked both abilities.  *Sabatino v. Liberty Life Assn. Co. of Boston*, 286 F.Supp.2d 1222, 1231 (N.D. Cal. 2003) (finding error in denial of benefits when cognitive impairment was not properly considered because "[s]imply being able to perform sedentary work does not necessarily enable one to work" in an occupation that requires "careful thought and concentration."), *Moon v. UnumProvident Corp*., 405 F.3d 373, 379 (6th Cir. 2005) (denial defective when evidence of cognitive impairment showed it was unlikely claimant could perform identified position); *Adams v. Prudential Ins. Co. of Am.*, 280 F.Supp.2d 731, 741 (N.D.

31

Ohio 2003) (decision to deny benefits was arbitrary and capricious when cognitive deficits were ignored).

13.    The determination that Mr. Barteau was disabled was shared by the Social Security Administration, who determined Mr. Barteau was unable to perform any work, a standard of disability of the same type as that in the Plan. *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2347 (2008).  Prudential's failure to even consider the award of Social Security Disability benefits as evidence that Mr. Barteau was disabled from any occupation is of concern.  This rises to a matter of serious concern because Prudential hired an advocate for Mr. Barteau to pursue these benefits, Prudential received a direct financial benefit from Mr. Barteau's receipt of these benefits, and then Prudential disregarded the Social Security Administrations findings when Prudential terminated Mr. Barteau's benefits.  *Glenn*, 128 S.Ct at 2352.

14.    For almost four years Prudential found Mr. Barteau to be disabled. Yet in support of the termination of Mr. Barteau's benefits, and in litigation, Prudential has not identified any affirmative medical evidence which showed an improvement in Mr. Barteau's conditions and disabling symptoms or vocational evidence which identified employment options.  The compelling evidence in the record corroborates the continued and stable severity of Mr. Barteau's symptoms and deficits, and, upon *de novo* review of the entire record, supports a finding that Mr. Barteau continued to be disabled under the terms of the Plan.

15.    Mr. Barteau was suffering from a disability under the terms of the Plan at the time that his benefits were terminated by Prudential.

16.    Prudential wrongfully terminated Mr. Barteau's benefits.

17.    Under ERISA Mr. Barteau is entitled to recover benefits due to him under the terms of the Plan.  29 U.S.C. § 1132 (a)(1)(B).  Mr. Barteau's damages with respect to his benefits are equal to the missed disability benefits over the period from October 26, 2006 to the date of judgment.

18.     Mr. Barteau is also entitled to a declaration of his right to future benefits under the terms of the Plan.  29 U.S.C. § 1132 (a)(1)(B).  The Court has determined that Mr. Barteau was disabled under terms of the Plan when Prudential wrongfully terminated his benefits effective October 26, 2006.  Mr. Barteau is therefore entitled to benefits under the Plan as determined by its terms.

19.     Mr. Barteau also seeks an award of pre-judgment interest on the award pursuant to the Court's discretion under ERISA.  The Court finds that the equities balance in favor of an award of pre-judgment interest to Mr. Barteau.

20.     Mr. Barteau has been deprived of the value of the benefits to which he was entitled for the entire period from October 26, 2006 to the date of judgment.  As such, Prudential, and not Mr. Barteau, has derived benefit from those funds (including interest), and Mr. Barteau has been forced to bring the present action to recover funds to which he was entitled.  As the Supreme Court has often stated, "prejudgment interest is an element of [plaintiff's] complete compensation."  *Osterneck v. Ernst & Whitney*, 489 U.S. 169, 175 (1989) (internal quotation and citation omitted).  There is no evidence that an award of prejudgment interest would unduly burden defendants, or their respective policy-holders.  As such, the Court holds that such an award is appropriate.

21.     Mr. Barteau is the "prevailing party" in the instant suit, and may therefore be entitled to recovery of reasonable attorneys' fees and costs.  *See* 29 U.S.C. § 1132 (g)(1); *Barnes v. Indep. Auto. Dealers Assoc. of Cal. Health & Benefit Plan*, 64 F.3d 1389, 1397 (9th Cir. 1995).

22.     The amount of attorneys' fees and costs to be awarded will be determined on a separate motion therefor to be filed by Mr. Barteau in accordance with Rule 54-12 of the Local Rules.

23.     Prior to filing any motion, counsel for Mr. Barteau and defendants should meet and confer on the amount of a total award for benefits due Mr. Barteau consistent with both the findings and conclusions of the Court and the terms of the Plan, prejudgment interest upon those benefits, and on reasonable attorneys' fees and costs.

Thereafter, the parties must submit to this Court a stipulation regarding the award of benefits and prejudgment interest. This may be in the form of a [Proposed] Final Judgment.  If, following the meet and confer, the parties are not able to agree upon the amount of reasonable attorneys' fees and costs, Mr. Barteau may make a motion for an award of attorneys' fees and costs.

## III.   CONCLUSION

For the foregoing reasons, the Court will enter judgment in Mr. Barteau's favor, reinstate him to the Plan, with payment of back benefits to date of judgment including prejudgment interest.


**IT IS SO ORDERED.**


DATED: <u>May 26, 2009</u>          _____

                              HON. RONALD S. W. LEW
                              SENIOR, U.S. DISTRICT COURT JUDGE

34